Affirmed and Memorandum Opinion filed July 7, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00170-CR

___________________

 

Brian Ranard Davis, Appellant

 

V.

 

State of Texas, Appellee



 



 

On
Appeal from the 248th District Court

Harris County,
Texas



Trial Court Cause No. 1223497

 



 

 

MEMORANDUM OPINION

Appellant, Brian Ranard Davis, appeals
his conviction for capital murder.  Tex. Penal Code Ann. §§ 12.31(a), 19.03(a)(2)
(West 2011).  Finding no error, we affirm.

Factual and Procedural Background

            Early on the
morning of August 4, 2007, Angela Manuel was a passenger in an automobile
travelling on McFarland Road in the Greenspoint area of Harris County.  Manuel
noticed something in the car’s headlights that looked like a foot.  Manuel
asked the driver to stop the vehicle and back-up.  Manuel got out of the car
and discovered a body on the side of the road.  Manuel then called 9-1-1.

            Numerous deputies
with the Harris County Sheriff’s Department responded to the scene at the 200
block of McFarlane.  They found a partially clothed female body that had been
set on fire and burned.  The upper part of the body was on the grass while the lower
portion of the body was on the pavement.  Deputy Gail Mills, the crime scene
investigator, determined the area around the body had also been burned.  There
were no shoes on the body and Mills observed soot on the bottoms of her feet. 
Mills also noticed cuts on the feet and a wound to the left foot.  Mills
documented a stab wound to one elbow as well as a stab or puncture wound to the
left side of the body’s neck.  Mills observed that the body was wearing a partially
burned black and green striped top.  Mills also observed a ring on the body’s
right hand and a pair of drop earrings.  The investigators did not find any
identification on the body; however, Mills was able to obtain a fingerprint
from the body at the scene.

            Mills also
recovered numerous items from the scene, including a purple cigarette lighter. 
Mills processed the lighter for fingerprints and swabbed it for DNA.  Mills was
not able to locate an identifiable fingerprint on the lighter.  Mills submitted
the swabs taken from the lighter for DNA analysis.

            Sergeant Holtke
was the lead investigator on this case.  Holtke asked the Harris County Medical
Examiner’s Office to take photographs of the ring and earrings found on the
body.  Holtke eventually released the photographs to the media as part of the
effort to identify the body.  Holtke also notified Crime Stoppers in case they
received any calls related to the body.

            Shynike Allen
shared an apartment with her cousin Kandus Hightower Sharp in the Greenspoint
area.  According to Allen, Sharp was working as a prostitute.  Allen last saw
her cousin on Friday, August 3, 2007.  Allen was leaving for Huntsville and
last saw her cousin in bed with Allen’s two young children.  When Allen
returned from Huntsville that same evening, Sharp was not there, but her shoes
and purse were still in the apartment.  While Allen found this unusual for
Sharp, she did not immediately contact the police regarding her absence.

            Sometime later
that week, Allen saw information on television regarding the body that had been
found on McFarlane Road.  The information included a composite sketch and
pictures of the ring and earrings found on the body.  Allen recognized the ring
as one Sharp had recently purchased.  Allen contacted her relatives and Sharp’s
mother located and then turned over to the Harris County Sheriff’s Department
fingerprints of Sharp that she had gotten years before as part of a child
identification program.  From this set of fingerprints, Mills identified the
body found on McFarlane Road as that of the missing Sharp.  

            Dr. Darshan
Phatak, an assistant medical examiner with the Harris County Medical Examiner’s
office, conducted the autopsy on Sharp’s body.  Phatak determined that Sharp
had suffered cuts to the left side of her foot, third finger on her right hand,
back of her right hand, left forearm, and a stab wound to her neck.  According
to Phatak, the injuries to her finger, hand, and forearm could have been
defensive wounds.  Phatak also discovered that Sharp had a contusion to her
inner, lower lip and a contusion to her mid-frontal scalp.  Phatak determined
these contusions occurred before death.  The most significant wound Phatak
found was the stab wound to the left side of the neck.  Phatak stated that an
undetermined type of weapon “entered the left side of the neck, severed blood
vessels on the left side of the neck, crossed the midline of the neck behind
the throat, perforated major blood vessels on the right side of the neck and
ended within the right sternocleidomastoid muscle.”  Phatak opined that the
neck wound was capable of causing death, the weapon that was used was a deadly
weapon, and the wound was one of the causes of Sharp’s death.  

            Phatak also
addressed the burning of the body.  According to Phatak, ninety-five percent of
Sharp’s total body surface area was charred.  Phatak determined that Sharp
experienced “full penetrated burns to her body” which means the “burns
penetrated not only the skin and the subcutaneous soft tissues, mostly fat, but
they extended to the bone and the internal organs.”  Phatak discovered soot
deposits within Sharp’s upper respiratory tract, her lungs, and in her
trachea.  According to Phatak, this establishes that Sharp was still alive when
she was set on fire and breathed the soot particles.  Finally, Phatak opined
that the fire was a deadly weapon and the fire was also a cause of Sharp’s
death.

            Holtke testified
during appellant’s trial about the investigation once Sharp had been identified
as the victim.  According to Holtke, the Sheriff’s Department attempted to
track-down multiple leads and suspects.  One of the early suspects was Floyd
Barnes, a friend of Sharp’s.  Holtke testified Sharp and Barnes “would hang out
together.”  Barnes was an early suspect because the police learned that he had
made threats against Sharp.  Alberto Arellano was identified as someone Sharp was
seen “hanging out with” was also considered an early suspect in the case. 
Eventually, both Barnes and Arellano were eliminated as suspects.  When those
suspects were eliminated, the investigation stalled.  

            The investigation
remained stalled until January 2008 when Holtke spoke with Officer Straughter
of the Houston Police Department (“HPD”).  Holtke’s conversation with
Straughter led Holtke to a new suspect in Sharp’s death.  Around that same
time, Kennard Hunter, a friend of appellant’s, made contact with HPD.[1]  Hunter eventually
gave a videotaped statement to HPD investigator Darcus Shorten in which he
revealed appellant’s conversations with him regarding appellant’s involvement
in Sharp’s death.  Hunter told Shorten that the car appellant used, a
Mitsubishi Galant owned by appellant’s girlfriend, was involved in Sharp’s
death.  Based on the information in Hunter’s statement, Shorten sought a search
warrant to seize and search the Mitsubishi Galant.  In the affidavit attached
to the search warrant application, Shorten stated, in part:

            THERE IS, IN HOUSTON, HARRIS COUNTY, TEXAS, A
SUSPECTED PLACE AND PREMISES DESCRIBED AND LOCATED AS FOLLOWS: a motor vehicle
more particularly described as a 1999 4-door Burgundy Mitsubishi with Texas
License Plate number, 855CSV which is registered to Tonya Nicole Fishe [sic]. 
Tonya Nicole Fisher resides at 9410 Willow Wood Lane, Houston, Texas 77086. 
Your affiant has observed said vehicle in the driveway of this residence within
the past ten days.

            THERE IS BELIEVED TO BE WITHIN SUSPECTED PLACE
AND PREMISES: evidence tending to show that Brian Davis committed the murder of
Candace Marie Douglas in Houston, Harris County, Texas on June 6, 2007 and
murder of Kandus Yvonne Hightower-Sharp in Harris County, Texas on August 4,
2007. …

            YOUR AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF
BY REASON OF THE FOLLOWING FACTS: your affiant, Darcus R. Shorten, is a peace
officer currently employed with The City of Houston Police Department (H.P.D.)
Homicide Division as an investigator.  Your affiant has been in the field of
law enforcement for twenty years and is currently assigned to investigate
homicides as her primary responsibility.

            Your affiant has reason to believe, and does in
fact believe, that the above described vehicle contains item(s), including but
not limited to: biological evidence such as blood, semen, hair, other bodily
fluids; weapons; flammable materials and other items pertinent to the
investigation of the above listed murders.

            Your affiant has been assigned to investigate
the murders of six females which occurred between April 2006 through September
2007 and whose bodies were discovered in and around the north area of Houston. 
All the females were either nude or partially nude, and each was found in
grassy areas.  These murders have commonly been referred to as the “Acres Home
Killings.” …

            Offense reports also indicate that on August 4,
2007 the burned body of an African American female was located in the 200 block
of McFarland, Harris County, Texas.  This body was later identified by the
Harris County Medical Examiner’s Office as Kandus Yvonne Hightower-Sharp.  The
200 block of McFarland lies just outside the Acre’s Home Area.

            Your affiant was able to locate and identify a
witness named Kennard Hunter.  Hunter is believed by your Affiant to be a
credible person.  Hunter contacted Houston Police Officers following the murder
of another Acres Home victim on September 22, 2007.  An anonymous informant had
told your Affiant that the September 22, 2007 victim had last been seen in a
burgundy 4-door car driven by a black male.  Hunter told your Affiant that in early
2007 when he moved to the Northborough area, which is a short distance from
Acres Home, the first person he became friends with was Brian Davis. …

            Your affiant questioned Kennard Hunter
concerning why he had not told the police earlier about what he knew, and he
responded that he was afraid.  Hunter stated it was not until after the second
girl was found that he decided to come forward.  Kennard Hunter stated a couple
of months after Douglas was killed he observed a girlfriend of Brian Davis whom
he knew as “Tonya” walking in the same Northborough apartment complex and that
she appeared upset.  Hunter later identified a known Texas Driver’s License
photograph of Tonya Fisher as depicting Davis’ girlfriend that he knew as
Tonya.  Hunter stated he asked Tonya where “Baby Boy” was (meaning Davis) and
she pointed at Davis walking behind her.  Hunter stated that Davis also
appeared upset and he again observed fresh red scratches on this [sic] face. 
Hunter stated that he asked Davis what was wrong and he responded, “man you’re
not going to believe this, but I got a girl in the trunk of the car right
now.”  Hunter stated that Davis was referring to Tonya’s car.  Hunter stated
that he looked at Davis in disbelief and Davis stated he had a “beef” with some
females, and he wanted to catch one of them alone to settle the score.  Hunter
said that Davis then told him that he saw one of the females walking down F.M.
1960 and when he pulled over they got into a fight, and that was when he was
scratched in the face.  Davis told Hunter that he strangled the girl, and
placed her in the trunk of the car because he needed to pick up his girlfriend,
meaning Fisher, from work.

            Kennard Hunter stated that Brian Davis told him
while he and Tonya were driving the girl, meaning the victim, woke up and was
kicking the back seat from the trunk.  Davis stated that his girlfriend
questioned him about the noise, and he stated that he made up something and
turned the music up loud.  Hunter stated Davis then left.  Hunter stated he saw
Davis later and was told “man I had to re-kill that girl again, and I just
burned her body.”  Your affiant believes this victim to be Hightower-Sharp. 
Kennard Hunter stated that was when he knew he had to say something, so he began
to call anonymously to HPD Homicide to tell them about what he knew about
Davis.

The address listed on Tonya
Fisher’s Texas Driver’s License is 9410 Willow Wood Lane, Houston, Harris
County, Texas.  Your Affiant has personally observed Brian Davis at that
address.  The above listed vehicle is registered to Tonya Fisher and was so
registered during the commission of the above listed murders.  Your Affiant
knows through training and experience that if biological evidence is located
within said vehicle it can be subjected to DNA analysis to be compared to the
DNA profile of samples maintained from the autopsies of the above listed murder
victims to determine if profiles match.  A match of these profiles will
corroborate the information received from Kennard Hunter to show that Brian Davis
committed the above described murders.

            The magistrate
signed the search warrant on March 5, 2008.  HPD officers and Sheriff’s
Deputies executed the warrant on March 7, 2008 and found the Galant in Fisher’s
driveway.  When the police knocked on the door, appellant answered.  When told
the police were taking possession of the car, appellant became agitated, upset,
yelled, used profanity, and acted aggressively.  Fisher and the deputies intervened
and calmed appellant down.  The police took the car to be processed by an
evidence recovery team from the Federal Bureau of Investigation (“FBI”).  The
FBI evidence recovery team examined the Galant on March 13, 2008.  Following
the search of the Galant, the FBI team released six swabs taken from the trunk
of the Galant to Mills.  Mills in turn submitted the swabs to the Harris County
DNA laboratory.  

Mark Powell, a DNA analyst with the Harris County
Medical Examiner’s Office, testified during appellant’s trial.  He testified
that an analysis of the DNA on the swabs taken from the Galant’s trunk showed
that on five of them Sharp’s DNA was included as a source to a statistical
certainty of 1 in 1.1 quintillion African-Americans.  Powell also testified
that comparison of the DNA samples from the Galant and the crime scene with
known DNA samples from Hunter, Barnes, and Arellano excluded each of them as a
possible contributor.

Powell also testified regarding the DNA swab taken
from the purple lighter found at the scene.  The swab revealed a mixture of DNA
that included Sharp’s known profile and from which appellant’s profile could
not be excluded.  Powell testified that the mixture on the lighter included a
profile consistent with Sharp’s such that 1 in 1.58 million African-Americans
would be included as a possible contributor.  In addition, Powell compared the
mixture from the lighter with appellant’s profile and concluded appellant was a
possible contributor to the mixture.  According to Powell, the analysis of
appellant’s profile and the mixture on the lighter produced a statistical
analysis of 1 in 13,620 African-Americans.  Powell explained that of the approximately four million people in Harris
County, roughly one million are African-American, which meant there would be approximately
eighty other people in Harris County who have DNA consistent with the profile
on the lighter.    

            Hunter also
testified during appellant’s trial.  Hunter stated that he grew-up in the Acres
Home area of Houston.[2] 
In March of 2007 Hunter moved to an apartment in the Greenspoint area.  Hunter
was new to the Greenspoint area.  Soon after moving into the Greenspoint
apartment, Hunter met appellant, who was living in the same apartment complex. 
According to Hunter, they became “real close.”  During trial Hunter testified appellant
showed him around the Greenspoint area and they would “hang out, chill, walk
around, talk, have fun with one another, just chilling.”  

            According to
Hunter, at the time they met, appellant did not have a girlfriend.  However, in
the summer of 2007, appellant acquired a girlfriend: Tonya.  Hunter then
explained that Tonya, who worked and went to school, owned a small car.  Hunter
explained that appellant would take Tonya to school and work and would then use
Tonya’s car.  

            Late in the
summer of 2007 appellant told Hunter that three girls and their brothers wanted
to “jump” him.  Appellant then told Hunter that he wanted to catch the girls
one-by-one.

On a day when Hunter and appellant had spent the
earlier part of the day “just kicking it,” appellant left to drop “somebody off
on 1960.”  Later that same day, appellant saw Tonya walking from the direction
of appellant’s apartment.  Hunter observed that Tonya looked confused or had
something on her mind.  Hunter asked: “Tonya, where’s my brother?”  Tonya then
pointed behind her and Hunter saw appellant walking up.  Hunter then approached
appellant.  When he did, Hunter noticed scratches on appellant’s neck and his
clothes were “all bunched up.”  Hunter asked appellant what happened to him. 
Appellant then grabbed Hunter and whispered in his ear: “I caught the bitch.” 
Appellant then revealed he had the girl, one of the girls that wanted to “jump”
him, in the trunk of the car.  Appellant told Hunter he found the girl on FM-1960,
he grabbed her, and then threw her in the trunk.  Appellant also explained that
he had the girl in the trunk when he picked Tonya up from work and he “heard
the girl kicking in the trunk, so he turn [sic] the radio up so his girlfriend
wouldn’t hear.”  

The next day, appellant told Hunter: “Bro, you ain’t
going to believe this, I had to re-kill her.”  Appellant told Hunter that he
discovered the girl was not dead and he burned her up.  Appellant explained he
had taken her for a ride and dumped the girl’s body.  Hunter also testified
that he heard talk about the crime in the apartment complex, but he did not
call the police because he felt loyalty to appellant.  Hunter did testify that
he began to distance himself from appellant.  

On February 4, 2010 appellant filed a pre-trial
motion to suppress “all tangible evidence seized on or about the [sic] March 5,
2008 and April 22, 2008.”  Appellant asserted the evidence should be suppressed
because the search was “not made under the authority of a valid search warrant”
because “the probable cause affidavit was based on false statements.”

On February 12, 2010, appellant filed a document
titled: “Statements From the Affidavit That Should Be Suppressed.”  This
document lists six paragraphs from Hunter’s HPD statement that appellant argued
should be suppressed.  Appellant only asserted that one of the six paragraphs should
be suppressed because it was “a complete falsehood [appellant] never makes
[sic] these statements.”[3] 
Appellant gave no reason why the remaining paragraphs should be suppressed and
attached no evidence to the document.  The document also included a list entitled:
“Omissions From Affidavit.”  This document lists five “key points” appellant
argued the affidavit lacked: (1) Hunter was a gang member; (2) Hunter was a
convicted felon; (3) Hunter allegedly assaulted appellant in November 2007 and
Shorten, the affiant, never investigated this allegation; (4) Hunter allegedly
participated in an assault on appellant in January 2008 and Shorten had again
not investigated the allegation; and (5) Shorten did not explain why she believed
Hunter was credible.

The State filed “State’s Response to Defense Request
for Delaware v. Franks Hearing.”[4] 
In the Response, the State asserted the trial court should deny appellant a Franks
hearing because “the Motion failed to meet the threshold requirements for a
hearing.”  According to the State, appellant did not submit evidence
demonstrating that Shorten, the police officer drafting the probable cause
affidavit, made deliberate misrepresentations or showed a reckless disregard
for the truth in her affidavit.

On February 12, 2010, the trial court held a
pre-trial hearing regarding a variety of motions filed by appellant.  After
appellant’s trial counsel informed the trial court that he was finished, the
trial court asked about appellant’s motion to suppress.  The prosecutor
explained that the evidence at issue in appellant’s motion to suppress was
seized pursuant to a search warrant.  Next, the prosecutor asserted appellant’s
motion to suppress contained only conclusory statements that did not establish
the affiant made statements that were deliberate falsehoods or based on the reckless
disregard of the truth.  The prosecutor then asked the trial court to deny
appellant’s request for a Franks hearing.  

In response, appellant’s trial counsel admitted he
had difficulty meeting “the threshold of Franks Delaware.”  Appellant’s
trial counsel further admitted knowing that Franks “is not a discovery
tool nor cross-examination opportunity for the defense counsel.”  Despite that
knowledge, appellant’s trial counsel went on to say “we think there is [sic]
some due process concerns.  The reason I bring this up, Your Honor, Officer
Shorten and Mr. Hunter had some sort of relationship that we need to inquire
on, and we’d like to be able to call both Shorten and Mr. Hunter to the
stand.”  Appellant’s trial counsel then concluded his argument as follows:

…because of the due process issue there, that should be
explored through cross-examination from Shorten and Mr. Hunter.  Judge, we just
feel, even though we know we’re not technically within the confines of Franks
that the relationship of Officer Shorten and Hunter should be brought forth to
this Court to understand why she would issue this affidavit from information
knowing Hunter had a beef against [appellant].

The trial court then stated it had “reviewed the
search warrant and the affidavit that is the subject of this case and the
Motion to Suppress and I am not going to extend the law … beyond what it is.” 
The trial court then denied the hearing and concluded the evidence was
admissible. 

            Following the
close of the evidence, the jury found appellant guilty as charged.  The trial
court then imposed the mandatory sentence of lifetime confinement in the Texas
Department of Criminal Justice, Institutional Division without the possibility
of parole in accordance with Texas Penal Code Section 12.31(a).  This appeal
followed.

Discussion

            Appellant brings
four issues on appeal; which we consolidate into three.  Appellant’s first two
issues are directed at the trial court’s denial of his motion to suppress
evidence.  Appellant’s consolidated third issue challenges the sufficiency of
the evidence.

I.         Did the trial
court err when it denied appellant’s motion to suppress?

In his first issue, appellant contends the trial
court erred when it denied his motion to suppress because Shorten’s search
warrant affidavit, on its face, failed to establish that Hunter was a credible
witness.[5] 
In his second issue, appellant asserts the search warrant affidavit failed to
establish probable cause because the affiant (1) intentionally misrepresented
Hunter’s credibility; and (2) omitted critical information that impacted
Hunter’s credibility.

A.        The standard of review and applicable
law.

We apply a bifurcated
standard of review to a trial court’s ruling on a motion to suppress evidence. 
State v. Dugas, 296 S.W.3d 112, 115 (Tex. App.—Houston [14th Dist.]
2009, pet. ref’d) (citing Maxwell v. State, 73 S.W.3d 278, 281 (Tex.
Crim. App. 2002); Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim.
App. 2000)).  We give almost total deference to the trial court’s determination
of historical facts that depend on credibility and review de novo the trial
court’s application of the law to those facts.  Id.  We also review de
novo the trial court’s application of the law of search and seizure.  Id.
(citing State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)).  But,
when reviewing a magistrate’s decision to issue a warrant, trial and appellate
courts apply a highly deferential standard in keeping with the constitutional
preference for a warrant.  Rodriguez v. State, 232 S.W.3d 55, 61 (Tex.
Crim. App. 2007).

The Code of Criminal
Procedure allows for the issuance of a search warrant to seize property or
items that constitute evidence of an offense.  Dugas, 296 S.W.3d at 115
(citing Tex. Code Crim. Proc. Ann. art. 18.02(10) (West 2005) and Muniz v.
State, 264 S.W.3d 392, 396 (Tex. App.—Houston [1st Dist.] 2008, no pet.)). 
Before a search warrant may be issued, a sworn affidavit must be filed setting
forth sufficient facts to show probable cause that (1) a specific offense has
been committed; (2) the specifically described property or items to be searched
for or seized constitute evidence of that offense or evidence that a particular
person committed that offense; and (3) the property or items constituting such
evidence are located at or on the particular person, place, or thing to be
searched.  Id. (citing Tex. Code Crim. Proc. Ann. art. 18.01(c) (West
Supp. 2009)).

Probable cause to
support the issuance of a search warrant exists when a magistrate has a
substantial basis for concluding that a search would uncover evidence of
wrongdoing.  Id.  When making this determination, the magistrate is not
bound by such standards as proof beyond a reasonable doubt or by a
preponderance of the evidence; rather, the magistrate’s sole concern should be
probability.  Rodriguez, 232 S.W.3d at 60.  The test is whether a
reasonable reading of the affidavit by the magistrate would lead to the
conclusion that the affidavit provided a substantial basis for the issuance of
the search warrant.  Id. 

When reviewing an
issuing magistrate’s probable cause determination, an appellate court should
interpret the affidavit in a commonsensical and realistic manner, recognizing
that the magistrate may draw reasonable inferences.  Id. at 61.  When in
doubt, a reviewing court defers to all reasonable inferences that the
magistrate could have made.  Id.  The determination of whether an
affidavit established probable cause “is a flexible and nondemanding
standard.”  Id. at 60.  In determining whether there was probable cause
to issue the search warrant, reviewing courts should consider whether there are
sufficient facts, coupled with inferences from those facts, to establish a fair
probability that evidence of a particular crime will likely be found at the specified
location.  Id. at 62.  In other words, reviewing courts should focus on
the combined logical force of the facts included in the affidavit and not
whether there are other facts that could have or even should have been
included.  Id.  When determining the sufficiency of an affidavit to
establish probable cause, a reviewing court is limited to the four corners of
the affidavit.  Oubre v. State, 542 S.W.2d 875, 877 (Tex. Crim. App.
1976).  Whether the facts mentioned in an affidavit establish probable cause
depends on the totality of the circumstances.  Dugas, 296 S.W.3d at 116.

Under Franks, a
defendant bears the burden of showing by a preponderance of the evidence that a
probable cause affidavit contains a false statement made either knowingly and
intentionally or with reckless disregard for the truth.  Wise v. State,
223 S.W.3d 548, 555 (Tex. App.—Amarillo 2007, pet. ref.) (citing Franks,
438 U.S. at 156).  The Supreme Court did not extend the rule of exclusion to
instances where the police are merely negligent in collecting facts.  Id. 
If the false statement was material to establish probable cause, it must be
excised from the affidavit.  Arnold v. State, 47 S.W.3d 757, 758 (Tex.
App.—Houston [14th Dist.] 2001, pet. ref.)  If the abridged affidavit is insufficient
to establish probable cause, the warrant must be voided and its fruits excluded
from evidence.  Id.  The Supreme Court explained, however, that the
requirement of a truthful showing of probable cause does not mean “truthful” in
the sense that every fact recited in the warrant affidavit is necessarily
correct.  Id. at 758–59.  Rather, it must be “truthful” in the sense
that the information put forth is believed or appropriately accepted by the
affiant as true.  Id. at 759.

The Court of Criminal
Appeals has not yet determined whether a Franks analysis applies to
omissions as well as false statements.  Wise, 223 S.W.3d at 557 (citing Massey
v. State, 933 S.W.2d 141, 146 (Tex. Crim. App. 1996)).[6]  However, the
Fifth Circuit and Texas courts of appeal, including this court,[7] have held that
when a defendant seeks to suppress evidence lawfully obtained by a warrant, the
defendant must establish by a preponderance of the evidence, that the omission
was made knowingly, intentionally, or with reckless disregard for the truth in
an attempt to mislead the magistrate.  Darby v. State, 145 S.W.3d 714,
722 (Tex. App.—Fort Worth 2004, pet. ref.).

B.        Did
Shorten’s affidavit establish probable cause?

In his first issue,
appellant contends Shorten’s search warrant affidavit was insufficient to
establish probable cause because Shorten stated in a conclusory manner that
Hunter was a credible witness without further explanation and failed to provide
any underlying circumstances from which she concluded Hunter was credible and
the information he provided was reliable.  The appellant concluded: “[t]he
[a]ffidavit on its face lacks probable cause to issue a search warrant.  These
statements, without more, do not provide any underlying circumstances for which
a magistrate may make a determination that the informant was credible or his
information reliable.”  

We have addressed a
similar situation before in the case of Lockett v. State, 879 S.W.2d 184
(Tex. App.—Houston [14th Dist.] 1994, pet. ref’d).  The affiant in Lockett,
a federal agent, did not expressly address the credibility or reliability of a
confidential informant, but the agent did explain the basis of his knowledge
was the informant’s personal observations, which this court determined is “an
inherently reliable method of data collection.”  Id. at 188.  We
concluded “credibility and reliability of a confidential informant may be
bolstered by corroboration with independent police work or by
cross-corroboration with other informants.”  Id.  In Lockett, the
police corroborated the defendant’s address, vehicles kept at his residence,
recent land purchase, and a statement the defendant made to the informant that
he was a convicted felon.  Id.  In addition, a second informant
corroborated some of the information the agent relied on in his affidavit.  Id. 
We determined the evidence in the Lockett search warrant affidavit
contained sufficient indicia of reliability to support the issuance of the
search warrant.  Id.

Similarly, we conclude
the affidavit prepared by Shorten in this case contained sufficient indicia of credibility
and reliability to support the issuance of a search warrant for Tonya’s
automobile.  We reach this conclusion for several reasons.  First, Hunter was a
named, not an anonymous, informant.  Also, Shorten specifically stated in her
affidavit that Hunter “contacted [the police] following the murder of another
Acres Home victim on September 22, 2007.”  Second, Shorten’s affidavit
explained the origins of Hunter’s knowledge: he received the information either
directly from appellant, a close associate at the time the events underlying
this case were taking place, or as the result of observations he personally
made of appellant’s behavior.  Third, physical evidence corroborated some of appellant’s
statements to Hunter, which further demonstrated the basis of his knowledge as
well as the veracity of the evidence he was providing to the police. 
Specifically, Hunter reported appellant told him that he had “rekilled” the
girl by burning her body.  This information was confirmed by the fact the
police found the burned body of an African-American female which was later
identified as Sharp.  Shorten included this fact in her affidavit.  Hunter told
the police appellant was using his girlfriend’s car.  Hunter identified a
photograph of Tonya Fisher as appellant’s girlfriend; a girl he knew only as
“Tonya.”  Independent police investigation revealed Tonya owned a 1999 4-door
burgundy Mitsubishi that was registered to her on the date Sharp was murdered. 
Shorten personally observed both appellant and the 1999 Mitsubishi at Tonya’s
address.  Finally, an unnamed anonymous informant told Shorten that the September
22, 2007 murder victim was last seen in “a burgundy 4-door car driven by a
black male.”

Based on the totality of
the facts included in the affidavit, we conclude there was sufficient
information in Shorten’s affidavit for the magistrate to determine that Hunter
was credible and the information he provided police was reliable and the
magistrate was justified in concluding the affidavit was sufficient to
establish a fair probability that evidence related to Sharp’s murder would
likely be found in Fisher’s automobile.  Lockett, 879 S.W.2d 190.  We
overrule appellant’s first issue.   

C.        Did the trial
court err when it denied his motion to suppress based on Franks?

In his second issue,
appellant makes a dual-pronged attack on Shorten’s search warrant affidavit. 
First, appellant contends the trial court erred when it denied his motion to
suppress based on his allegation that Shorten included deliberate
misrepresentations or recklessly disregarded the truth in her probable cause
affidavit.  According to appellant, Shorten deliberately misrepresented that Hunter
was a credible witness because she knew Hunter was a gang member, had a prior
criminal conviction, and was allegedly involved in two different assaults on
appellant.  Next, appellant asserts the trial court should have granted his
motion to suppress because Shorten omitted that same information about Hunter
from the search warrant affidavit.

  We address appellant’s
contention that Shorten made deliberate misrepresentations or recklessly
disregarded the truth in her probable cause affidavit first. To support his
argument that Shorten misrepresented Hunter’s credibility, appellant claims Shorten
had knowledge of the background facts mentioned above and then, in spite of
this knowledge, misrepresented that Hunter was credible.  On appeal, appellant relies
on the trial testimony of HPD investigator Straughter, not Shorten, who did not
testify before or during appellant’s trial, that he “was told that [Hunter] was
possibly involved in the assault” and an argument that reckless disregard of
the truth can be “inferred from the omission of information from an affidavit.” 
We conclude appellant did not meet his initial burden under Franks to submit
evidence demonstrating that Shorten made deliberate misrepresentations or
recklessly disregarded the truth when drafting her affidavit.  In addition, we
conclude the trial court could reasonably rely on appellant’s trial counsel’s
concession that appellant did not meet the Franks threshold for a
hearing and instead was seeking an extension of the law to allow a pre-trial
cross-examination of both Hunter and Shorten as part of its determination whether
appellant met the initial Franks threshold.

We also conclude appellant’s
effort to substitute Hunter’s alleged misrepresentations as a basis for a Franks
hearing is unavailing because the only misrepresentations relevant under Franks
are those of the affiant, in this case Shorten, not the non-governmental
informant.  Franks, 438 U.S. at 171.  Therefore, we hold appellant did
not meet his burden under Franks and the trial court did not err when it
refused to grant appellant’s motion to suppress based on deliberate
misrepresentations.

Appellant also asserts that
Shorten omitted from her affidavit key background information about Hunter. 
According to appellant, these omissions, particularly those alleging Hunter
assaulted or participated in assaulting appellant, gave Hunter a motive to
fabricate incriminating statements against appellant.  Appellant’s argument
continues that if these background facts had not been omitted, the affidavit
would not have established probable cause.

With respect to Hunter’s
prior criminal conviction and gang membership, appellant presented no evidence
beyond the simple existence of these two facts.  We hold these simple facts do
not establish by a preponderance of the evidence that Shorten deliberately or
recklessly omitted the background information on Hunter’s criminal conviction
or gang membership in an effort to mislead the magistrate.

With regard to the
omission of Hunter’s alleged participation in the two assaults on appellant, the
only thing the trial testimony reveals is Straughter’s testimony that “I was
told that [Hunter] was possibly involved in the assault[.]”  However, this
small piece of trial testimony does not establish the truth of the accusation,
the timing of the accusation, or even that these allegations were known to
Shorten at the time she prepared the search warrant affidavit.  We hold
appellant once again did not meet his burden under Franks to establish
by a preponderance of the evidence that Shorten deliberately omitted these accusations
in an effort to mislead the magistrate.  Therefore, having addressed and
rejected each contention raised by appellant in his second issue, we overrule
appellant’s second issue.

II.        Is
the evidence sufficient to support the conviction?

            In
his consolidated third issue, appellant contends the evidence is insufficient
to support his conviction and therefore the trial court erred when it denied
his motion for directed verdict.  Texas courts have long treated such a
contention as a challenge to the sufficiency of the evidence and we do the same
here.  See Mapes v. State, 187 S.W.3d 655, 658 (Tex. App.—Houston [14th
Dist.] 2006, pet. ref’d) (citing Williams v. State, 937 S.W.2d 479, 482
(Tex. Crim. App. 1996)).

Appellant specifically
contends the State failed to prove appellant committed the crime because,
according to appellant, there was no physical evidence connecting appellant to
Sharp’s murder.  Appellant also argues there was no evidence proving appellant
knew Sharp, where she lived, or that she was initially apprehended in a
different place from the McFarland Road location where her burned body was
found.  Finally, appellant contends Hunter’s testimony created contravening evidence
so strong that the State could not have met its burden of proof.  In making
this argument, appellant points out Hunter’s prior criminal history, alleged
bias against appellant, and his allegedly inconsistent testimony. 

            A.        The
standard of review and applicable law.

            A
majority of the judges of the Texas Court of Criminal Appeals have determined
that “the Jackson v. Virginia legal-sufficiency standard is the only
standard that a reviewing court should apply in determining whether the
evidence is sufficient to support each element of a criminal offense that the
State is required to prove beyond a reasonable doubt.”  Brooks v. State,
323 S.W.3d 893, 895 (Tex. Crim. App. Oct. 6, 2010) (plurality op.).[8]  Therefore, in
this case, we do not separately refer to legal or factual sufficiency.

In a sufficiency review, we view all of the evidence
in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.
2781, 2789, 61 L. Ed. 2d 569 (1979); Salinas v. State, 163 S.W.3d 734,
737 (Tex. Crim. App. 2005).  The jury, as the sole judge of the credibility of
the witnesses, is free to believe or disbelieve all or part of a witness’
testimony.  Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). 
The jury may reasonably infer facts from the evidence presented, credit the
witnesses it chooses to, disbelieve any or all of the evidence or testimony
proffered, and weigh the evidence as it sees fit.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).  Reconciliation of conflicts in the
evidence is within the jury’s discretion, and such conflicts alone will not
call for reversal if there is enough credible evidence to support a
conviction.  Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App.
1986).  An appellate court may not re-evaluate the weight and credibility of
the evidence produced at trial and in so doing substitute its judgment for that
of the fact finder.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App.
2000).  Inconsistencies in the evidence are resolved in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  We do not engage in a
second evaluation of the weight and credibility of the evidence, but only
ensure the jury reached a rational decision.  Muniz v. State, 851 S.W.2d
238, 246 (Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d 775, 784
(Tex. App.—Houston [14th Dist.] 2005, pet. ref’d).

B.        Analysis

Appellant was charged with the offense of capital
murder.  A person commits capital murder if he intentionally or knowingly
causes the death of an individual while in the course of committing or
attempting to commit kidnapping.  Tex. Penal Code Ann. §§ 19.02(b)(1),
19.03(a)(2) (West 2011).  A kidnapping occurs when a person “intentionally or
knowingly abducts another person.”  Id. at § 20.03(a).  “Abduct” is
defined as restraining “a person with intent to prevent his liberation by: (A)
secreting or holding him in a place where he is not likely to be found; or (B)
using or threatening to use deadly force.”  Id. at § 20.01(2). 
“Restrain” is defined as restricting “a person’s movements without consent so
as to interfere substantially with the person’s liberty, by moving the person
from one place to another or by confining the person.”  Id. at §
20.01(1).  Finally, restraint is without consent if it is accomplished by
force, intimidation, or deception.  Id.

 We disagree with appellant’s assertion there was no
physical evidence connecting him to Sharp’s murder.  Initially, we point out
that the cigarette lighter found at the scene near Sharp’s charred body had a
DNA profile consistent with a mixture from Sharp and appellant.  The
statistical analysis placed the probability of inclusion of Sharp’s DNA on the
lighter at 1 in 1.58 million African-Americans.  While the statistical
probability that the mixture included appellant’s DNA was lower, 1 in 13,620
African-Americans, Powell, the DNA analyst, explained that meant only
approximately 80 other people in all of Harris County would have DNA which
would be included as a possible contributor to the mixture found on the
lighter.

The police also found Sharp’s DNA inside the trunk of
the car appellant used on a daily basis.  The statistical probability that the
DNA matched that of Sharp was set at 1 in 1.1 quintillion people.  The presence
of Sharp’s DNA was consistent with Hunter’s testimony revealing appellant’s
confession regarding kidnapping one of the females who wanted to jump him,
placing her in the trunk, and ultimately having to “rekill” her by burning. 
From this evidence, the jury could have inferred that, by placing Sharp in the
trunk, appellant intended to kidnap her.  See Mason v. State, 905 S.W.2d
570, 575 (Tex. Crim. App. 1995) (holding evidence legally sufficient to prove
capital murder in the course of a kidnapping when the defendant hogtied and
gagged his wife before placing her in the closed trunk of a car where she could
not escape or be seen when he transported her to the river where he killed her
because the evidence showed his intent to prevent his wife’s liberation by
secretion or deadly force).  In addition, based on the injuries to Sharp’s
body, as well as the blood found in the trunk, the jury could infer that
appellant used deadly force to kidnap Sharp.  See id.; see also
Swearingen v. State, 101 S.W.3d 89, 95–96 (Tex. Crim. App. 2003) (holding
jury could rationally conclude from the circumstantial evidence that the
defendant abducted the victim before he murdered her).

Also, while not physical evidence, the jury was
permitted to consider appellant’s behavior in relation to his girlfriend Tonya’s
car, which contained Sharp’s blood.  On two separate occasions, appellant
demonstrated an extreme reluctance to let the police examine Tonya’s Mitsubishi
Galant.  First, after having been shot, appellant refused to let the police examine
the Galant, which had been damaged in the incident.  Second, when the police
arrived at Tonya’s residence to serve the search warrant seizing Tonya’s car,
appellant reacted so aggressively, the officers took cover behind a car because
they feared for their safety.  The jury was permitted to consider this evidence
as indicating a consciousness of guilt on the part of appellant.  See Ross
v. State, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet.
ref’d) (“A defendant’s conduct after the commission of a crime which indicates
a ‘consciousness of guilt’ is admissible to prove that he committed the offense.”). 
Appellant’s effort to provide an alternative explanation for his reaction when
the police seized Tonya’s car does not impact our analysis as the jury was free
to accept or reject appellant’s proffered explanation.  In a sufficiency
review, we resolve any conflicts in the evidence in favor of the verdict.  Curry,
30 S.W.3d at 406.  Here, the jury chose not to accept appellant’s proffered
explanation and we conclude a rational jury could have done so.

In addition to the above physical evidence, the jury
could believe Hunter’s testimony about appellant’s participation in Sharp’s
murder.  Hunter testified that appellant told him there were three girls and
their brothers who wanted to jump him; but appellant wanted to preemptively
catch the girls one-by-one.  According to Hunter, appellant told him he encountered
one of the girls walking on F.M. 1960, he grabbed her, and threw her in the
trunk of his girlfriend’s car.  Hunter also testified during trial that
appellant told him that, after he had picked up his girlfriend, the girl in the
trunk started kicking so he turned up the car’s radio in an effort to prevent
his girlfriend from hearing the noise.  We conclude this is sufficient evidence
to prove appellant’s intent to kidnap Sharp.  See Hooper v. State, 214
S.W.3d 9, 15 (Tex. Crim. App. 2007) (recognizing juries may draw multiple
reasonable inferences “as long as each inference is supported by the evidence
presented at trial”); see also Childs v. State, 21 S.W.3d 631, 635 (Tex.
App.—Houston [14th Dist.] 2000, pet. ref’d) (holding that intent to commit a crime
is almost always proven through evidence of the circumstances surrounding the
crime, and allowing the jury to infer intent from the circumstantial evidence).

We turn to the evidence pertaining to whether
appellant knowingly and intentionally killed Sharp.  Appellant told Hunter he
had to “rekill” Sharp because he discovered she was not dead and ultimately
“burned her up.”  Hunter’s testimony about appellant’s comments is consistent
with the physical evidence found on the lighter which places appellant at the
scene where Sharp’s body was found.  It is also consistent with the Harris
County assistant medical examiner’s testimony that Sharp was still alive when
she was set on fire.  We conclude the evidence, including Hunter’s testimony,
is sufficient to prove beyond a reasonable doubt that appellant intentionally
and knowingly killed Sharp.

Finally, we turn to appellant’s contention that we
should reweigh Hunter’s testimony and determine it is not believable.  The jury
is the sole judge of the credibility of the witnesses and is free to believe or
disbelieve all or part of any witness’ testimony.  Jones, 984 S.W.2d at
257.  The jury obviously believed Hunter’s testimony regarding appellant’s
statements to him and we reject appellant’s invitation to overturn that
decision.

We hold appellant’s statements to Hunter, the
physical evidence linking appellant to the scene where Sharp’s charred body was
found, and the physical evidence linking Sharp to the Galant driven by
appellant on a daily basis, amounts to sufficient evidence from which a
rational jury could conclude beyond a reasonable doubt that appellant kidnapped
and then killed Sharp.  We overrule appellant’s third and final issue on
appeal.

Conclusion

            Having overruled
appellant’s issues on appeal, we affirm the trial court’s judgment. 

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Seymore, and McCally.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] During his trial
testimony Hunter explained the sequence of events that led him to speak with
the Houston Police.  Appellant told Hunter about his involvement with the death
of Sharp.  Concerned, appellant spoke with the manager of the apartment complex
and appellant’s mother.  Hunter hoped this would lead one or the other to
contact police.  After his conversation with the manager and appellant’s
mother, Hunter witnessed appellant being assaulted by Warren Fottenette. 
Eventually, Fontenette was arrested on another matter.  Following his release,
Fontenette gave Hunter the phone number for Officer Shorten of the Houston
Police Department.  





[2] During his trial
testimony, Hunter admitted that he had been convicted in 2005 for possession of
a controlled substance and also that he was a member of the Bloods street
gang.  Hunter testified that he was trying to get away from the gang
lifestyle.  Hunter also testified he was now married and had been employed
loading trucks for Staples for more than a year at the time of the trial.  On
cross-examination, Hunter admitted the Bloods’ color was red and that he was
wearing red clothing while testifying.





[3] This challenged paragraph
relates to a murder victim other than the complainant in this case.  In
addition, another of the six paragraphs relates to a murder victim other than
the complainant in this appeal.  Also, the information challenged in two of the
six paragraphs (without a reason given for their suppression) is duplicative of
the information found in two of the other paragraphs.





[4] Franks v. Delaware,
438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).





[5] To the extent appellant’s
first issue argues that the search warrant was insufficient to support a
showing of probable cause because it contained hearsay statements, we conclude
he did not preserve this issue for appellate review because he did not raise
hearsay as a basis to suppress the evidence in the trial court.  See
Rothstein v. State, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.]
2008, pet. ref’d) (stating that “[a] defendant’s appellate contention must
comport with the specific objection made at trial” and that “[a]n objection
stating one legal theory may not be used to support a different legal theory on
appeal.”).





[6] In Renteria v. State,
the Court assumed application of Franks to omissions.  206 S.W.3d 689,
704 (Tex. Crim. App. 2006) (holding that even if the omitted information had
been included in the probable cause affidavit, sufficient probable cause still
existed to issue the search warrant).





[7] Melton v. State,
750 S.W.2d 281, 284 (Tex. App.—Houston [14th Dist.] 1988, no pet.).





[8] Nonetheless, this does
not alter the constitutional authority of the intermediate courts of appeal to
evaluate and rule on questions of fact.  See Tex. Const. art. V, § 6(a) (“[T]he decision of [courts of
appeal] shall be conclusive on all questions of fact brought before them on
appeal or error.”)